## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH PATRICK LAWSON,  :
    Plaintiff,  :
                          :          CIVIL ACTION
             v.  :
                          :          NO. 12-6100
CITY OF COATESVILLE, et. al.  :
    Defendants.  :

**August  19  , 2014**                                      **Anita B. Brody, J.**

### MEMORANDUM

Plaintiff Joseph Lawson brings suit under 42 U.S.C. §§ 1983 and 1985 against the City of Coatesville ("Coatesville"), former Police Chief Julius Canale, Police Officer Brenden Boyle, and Police Corporal Jeffrey Ingemie.[1] Lawson claims that all defendants (collectively "Defendants") violated his Fourth and Fourteenth Amendment rights when they arrested and incarcerated Lawson without probable cause. Lawson alleges that Coatesville and Canale violated his constitutional rights by failing to establish and maintain a policy to train and supervise police officers as to the proper exercise of the power to arrest citizens. Lawson also brings Pennsylvania tort claims for false arrest, false imprisonment, malicious prosecution, and civil conspiracy against Canale, Boyle, and Ingemie.[2] Defendants move for summary judgment as to all claims. For the reasons stated below, I will grant Defendants' motion in part and deny it in part.

---

[1] Lawson brings suit against Canale, Boyle, and Ingemie in their individual capacities.

[2] I exercise federal question jurisdiction over Lawson's §§ 1983 and 1985 claims pursuant to 28 U.S.C. §§ 1331, 1343(a), and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

## I.  BACKGROUND

### A.  Lawson's Arrest and Incarceration

On October 29, 2010, Jeffrey Middleton, Jr. was robbed by at least two black men[3] in front of the Midway Diner in Coatesville. One of the robbers shoved a hard metal object into Middleton's back and demanded that Middleton empty his pockets. Middleton relinquished $70 and two bottles of prescription pills. Immediately after the robbery, Middleton walked across the street to a gas station and called the police. Officer Boyle, Corporal Ingemie, and several other unidentified officers responded to the scene.

Middleton told Boyle and Ingemie that two of the robbers were still in the area, hanging out together about 100 feet away from where the robbery took place. Middleton pointed across the street to where two people were standing. Boyle and Ingemie walked across the street and made contact with two African-American men—Lawson and another man named Lewis Lee Maxwell. When the officers encountered Lawson, he was talking to Maxwell next to the Midway Diner. The police detained Lawson and Maxwell, while one of the officers placed Middleton in a police car and brought the car around.

The police then conducted a field show-up. As part of the field show-up, the police escorted Lawson and Maxwell toward the police car, one at a time. From inside the police vehicle, Middleton identified two people from approximately 25-50 feet away. Middleton personally knew Maxwell and identified him to the police. Middleton did not recognize the other robber he identified. Middleton did not actually observe the police place the two men into a police car.

---

[3] The Police Complaint states that Middleton told the police that three men robbed him. In his Preliminary Hearing Testimony, however, Middleton testified that only two men robbed him. He also explicitly denied telling the police that three men were involved. Most recently, in his Deposition Testimony, Middleton again claimed that three men robbed him.

After the field show-up, the police arrested Lawson and Maxwell. They also drove Middleton back to the police station for an interview, but did not ask him to identify the suspects again. At the end of Middleton's interview, Ingemie asked Middleton if he was telling the truth and if he was "one hundred percent positive these are the individuals that did it." Pl.'s Ex. O at 14. Middleton stated that he was not making up his story and confirmed "[t]hat's exactly what happened and those are the individuals that did it." *Id*. After the interview, Ingemie called Assistant District Attorney Bonnie Cox-Shaw, who approved the robbery charges for Lawson and Maxwell.

The next day—October 30, 2010—Boyle filed a Criminal Complaint against Lawson. Boyle's Affidavit of Probable Cause described his encounter with Middleton and Middleton's subsequent field identification of Lawson.[4] That same day, Lawson was arraigned before Magisterial District Judge William D. Kraut. Lawson's preliminary hearing was scheduled for November 3, 2010, four days later. Subsequently, however, the preliminary hearing was continued five times—twice because Middleton was unavailable, twice by the defense, and once for unknown reasons. During this time, Lawson remained incarcerated at Chester County Prison.

On December 22, 2010, Lawson's preliminary hearing took place before Magisterial District Judge Gregory V. Hines. At the preliminary hearing, Middleton confirmed that Maxwell had robbed him, but denied that Lawson was one of the men that had robbed him. Middleton also denied that Lawson was the second man he had identified. Middleton testified that he identified a second robber for the police, but stated "they picked up Mr. Lawson, not the person that they should have picked up." Preliminary Tr. 9:22-10:2. Middleton then confirmed that "Mr. Lawson

---

[4] The Affidavit declares that Middleton "stated that two of the actors were still in the area, and were standing by a van on the east side of Pennsylvania Avenue by Harmony Street. Your affiant did make contact with Joseph Lawson, hereafter known as the defendant. The defendant fit the description of the actors provided by the victim, and was also positively identified during a field show up." Pl.'s Ex. B.

was not one of the individuals" who robbed him, and emphasized that he was "100 percent" sure. Preliminary Tr. 10:3-10. Middleton also stated that "I thought I identified the person that did it, because I saw him, you know what I mean? And I don't know how Mr. Lawson got involved, but apparently he did." Preliminary Tr. 27:12-15. Middleton further claimed that he thought he had identified a "younger man" wearing a white and black jacket while in the police car. Preliminary Tr. 13:23-14:8.

Based on Middleton's exculpatory testimony, Lawson's attorney moved for dismissal of the charges against Lawson. The Commonwealth did not oppose the request, and the judge dismissed the charges.

### B. Facts Relevant to Supervisory and *Monell* Liability

#### 1. Canale's Role and Supervisory Duties

Police Chief Canale had no knowledge of Lawson's arrest until Lawson filed this lawsuit. If a citizen files a complaint regarding an unlawful arrest, that complaint is normally first investigated at the administrative lieutenant level. An administrative lieutenant would oversee an internal investigation to determine whether an actual infraction occurred. If the investigation reveals an infraction, the investigator and the administrative lieutenant would make a recommendation based on the department's disciplinary policy. The chief would then evaluate the internal affairs investigative report and make a disciplinary decision.

#### 2. Training Received by Coatesville Police Officers

Officers in the Coatesville Police Department are initially trained at the Police Academy where they receive state-mandated Act 120 Training. A significant portion of this Act 120 Training focuses on search, seizure, and arrest. Additionally, police officers must successfully complete annual Act 180 training updates that include search and seizure legal updates.

Coatesville Police Officers also undergo a one-year field training program, in which they are under the supervision of a senior officer and must learn the policies and procedures of the department.[5] New officers typically make arrests and complete a wide variety of police tasks under the supervision of a field training officer who acknowledges whether the performance was acceptable. The field training officers document successfully completed tasks and keep a field training jacket for each officer.

Boyle received his Act 120 Training in Delaware County. The program was five-and-a-half months long—with approximately 700 hours of classes—and included training on arrests and the Fourth Amendment. Boyle has also completed his annual Act 180 updates—which include search and seizure training—each year since he started working for Coatesville in 2009. Boyle participated in Coatesville's field training program, but did not receive additional search and seizure training from the Coatesville Police Department.

Ingemie also received Act 120 Training and Act 180 updates that covered search and seizure requirements. He also received search and seizure training from the Coatesville police department as a part of his field training.

### 3. Coatesville Police Department Policies

Prior to Lawson's arrest, Coatesville had policies in place on "Arrest Warrants," "Corruption and Misconduct, Employee's Responsibility to Report," and "Complaints Against Police."[6] Coatesville also had a "Disciplinary Code" penalizing corruption, illegal activity, and mishandling of investigations, among other things.

---

[5] Police officers in the field training program are not directly supervised for the entire year. At some point, the training officer clears the new officers to patrol on their own, but they remain on probation and under the supervision of a field training officer for the entire year.

[6] Defendants also provided a Coatesville Police Department Policy on "Training" in support of their summary judgment motion. I decline to consider this Training Policy for the purposes of this motion,

Coatesville's "Arrest Warrants" policy defines probable cause and states that "[n]o arrest warrant shall be issued but upon probable cause." The "Arrest Warrants" policy further provides that "[w]arrantless arrests and searches are permitted where exigent circumstances exist" and provides factors for officers to consider in making a warrantless arrest.

Coatesville's "Corruption and Misconduct, Employee's Responsibility to Report" policy ("Misconduct Policy") states that it is "everyone's responsibility to immediately report" corruption, misconduct, and other improper acts. It further provides that "[a]ll members are required to immediately contact the Police Chief with any information about corruption, misconduct, or other similar conditions." The Misconduct Policy cites to Pennsylvania's Whistleblower Law and states that employees may not be discharged, threatened, discriminated against, or retaliated against for whistleblowing.

Coatesville's "Complaints Against Police" policy ("Complaints Policy") provides citizens with the opportunity to submit a formal complaint. It also sets forth the procedure for investigating allegations and for communicating the disposition of the complaint to the complainant. The Complaints Policy further provides that

> [s]upervisors, at each level of command, have a duty and responsibility to monitor the integrity and discipline of subordinates in a manner that preserve and protect the public's trust in the department. The public image of the agency is determined by the quality of the complaint/internal affairs process in responding to allegations of misconduct by the department employees. Supervisors shall appropriately inquire into any information that comes to their attention concerning misfeasance, malfeasance, and nonfeasance of department employees.

Lastly, Coatesville's "Disciplinary Code" provides penalties for the following charges:

---

however, because I cannot determine if the policy was in place at the time of Lawson's arrest. The policy is dated October 2012—nearly two years after the events in question took place.

- Failure to report to the Police Chief knowledge of corruption within the Department, including but not limited to any illegal act committed by a member of the Department

- Knowingly and willfully making a false entry in any Departmental report or record

- Failure to properly supervise subordinates; or to prefer disciplinary charges; or to take appropriate disciplinary action

- Failure to conduct proper, thorough, and complete investigation or failure to thoroughly search for, collect, preserve and identify evidence of persons, property and locations in any arrest or investigation

- Failure to follow Departmental procedures for the handling of evidence.

### 4. Complaints Against Police Officers

According to Coatesville's incident reports, only eight complaints against police officers were made between 2008 and 2013. Two of these complaints were made in 2008, one was made in 2009, and four were made in 2010. The incident reports do not specify the nature of the complaints or the alleged misconduct.

Jeffrey Martin and Tekeesha Lovelace—a married couple living in Coatesville—have each filed "false arrest" suits against the Coatesville Police Department. Both Martin and Lovelace are African-American. Martin alleged that Ingemie wrongly arrested Martin twice based on inaccurate warrants. In 2009, Ingemie arrested Martin on a traffic warrant for a different Jeffrey Martin. In 2010, Ingemie arrested Martin on a domestic relations warrant that was no longer valid because it had been satisfied. Martin contended that, in both cases, Ingemie ignored Martin's protestations that the warrants were invalid and did not properly check the validity of these warrants before arresting Martin. In each instance, Martin was released shortly after the arrest, once the mistake was discovered. In addition to filing a lawsuit, Martin filed a citizen complaint with the Coatesville Police Department regarding these incidents, but received no response.

Lovelace also alleged that the Coatesville Police Department falsely arrested her based on two incidents that occurred in 2009 and 2010. Lovelace crashed her car into the yards of Coatesville residents on two occasions—once into a person's fence and once into a person's garage.[7]  When the police responded to the accidents, they charged Lovelace with driving under the influence of drugs. Lovelace denied that she was intoxicated and asserted that the police lacked probable cause to arrest her in both cases. Boyle was one of two responding officers involved in 2010 arrest. In both cases, the charges against Lovelace were dismissed.

## II.  LEGAL STANDARD

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). After the moving party has met its initial burden, the nonmoving party must then "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In ruling on a motion for summary judgment, the court must draw all inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec.*

---

[7] It is unclear whether Lovelace actually filed a lawsuit for the 2010 false arrest incident.

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claims. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

In essence, the inquiry at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III.  DISCUSSION

### A.  § 1983 Claims

"To establish liability under 42 U.S.C. § 1983, a plaintiff must show that the defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Elmore v. Cleary,* 399 F.3d 279, 281 (3d Cir. 2005). Lawson's brings § 1983 claims against Defendants for violation of his Fourth Amendment right to be free from false arrest, unlawful search, false imprisonment, and malicious prosecution. Lawson also asserts Fourteenth Amendment claims for violations of the Equal Protection Clause and the Due Process Clause.

#### 1.  Fourth Amendment Claims Against Boyle and Ingemie

Defendants argue that summary judgment should be granted as to Lawson's Fourth Amendment claims, because Boyle and Ingemie had probable cause to arrest Lawson based on Middleton's identification. Lawson contends, however, that Boyle and Ingemie lacked probable cause because Middleton did not actually identify Lawson at the field show-up.

The threshold question for each of Lawson's Fourth Amendment claims is whether Boyle and Ingemie had probable cause to arrest Lawson. *See James v. City of Wilkes-Barre*, 700 F.3d 675, 680, 683 (3d Cir. 2012) (lack of probable cause is an element of a Fourth Amendment false

arrest claim); *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007) (lack of probable cause is an element of a Fourth Amendment malicious prosecution claim); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995) (lack of probable cause is an element of a Fourth Amendment false imprisonment claim based on detention pursuant to an unlawful arrest); *Henry v. United States*, 361 U.S. 98, 102 (1959) ("[I]f an arrest without a warrant is to support an incidental search, it must be made with probable cause."). If Boyle and Ingemie had probable cause, then no constitutional violation took place. "An arrest was made with probable cause if 'at the moment the arrest was made . . . the facts and circumstances within [the officers'] knowledge . . . were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense.'" *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005) (quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)). "In other words, the constitutional validity of the arrest does not depend on whether the suspect actually committed any crime." *Id*.

"Generally, the question of probable cause in a section 1983 damage suit is one for the jury.  This is particularly true where the probable cause determination rests on credibility conflicts."  *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (citations and internal quotation marks omitted). "However, a district court may conclude that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and may enter summary judgment accordingly." *Id*.  at 788-89 (internal quotation marks omitted).

Taking the evidence most favorable to Lawson, a genuine dispute of material fact exists as to whether Boyle and Ingemie had probable cause to arrest Lawson. There is no dispute that Boyle and Ingemie conducted a field show-up in which both Maxwell and Lawson were escorted toward the police car. There is also no dispute that Middleton identified two people from inside

the police car. However, there *is* a genuine dispute of material fact as to whether Middleton

actually identified Lawson while he was in the police car. At the preliminary hearing, Middleton

vehemently claimed that Lawson was not one of the robbers and was not the person he

identified. If Middleton did not in fact identify Lawson, Boyle and Ingemie would have lacked

probable cause to arrest him. Because the probable cause determination rests on credibility

conflicts, this is an issue for the jury. The jury must evaluate the credibility of Middleton, Boyle,

Ingemie, and Lawson to determine whether Middleton identified Lawson to the officers. I will

therefore deny summary judgment as to Lawson's § 1983 claims against Boyle and Ingemie for

false arrest, unlawful search, false imprisonment, and malicious prosecution.[8]

### 2. Fourteenth Amendment Equal Protection Claim

Lawson alleges that Defendants deprived him of his Fourteenth Amendment right to

equal protection by arresting, incarcerating, and prosecuting him without probable cause.

Defendants argue that Lawson's equal protection claim cannot succeed because Lawson does not

provide evidence that he was treated differently than similarly situated individuals or that he

experienced purposeful discrimination.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend.

---

[8] Boyle and Ingemie also argue that summary judgment should be granted as to Lawson's malicious prosecution claim, because there is no evidence that they acted with malice. To prove a Fourth Amendment malicious prosecution claim, a plaintiff must show, among other things, that the defendants "acted maliciously or for a purpose other than bringing the plaintiff to justice." *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007). "Actual malice in the context of malicious prosecution is defined as either ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." *Lee v. Mihalich*, 847 F.2d 66, 70 (3d Cir. 1988), *abrogated on other grounds*, *Albright v. Oliver*, 510 U.S. 266 (1994). "Malice may be inferred from the absence of probable cause." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir.1993), *abrogated on other grounds*, *Albright v. Oliver*, 510 U.S. 266 (1994). If the facts are taken in the light most favorable to Lawson, a jury may infer malice if Boyle and Ingemie lacked probable cause to initiate Lawson's prosecution. I will therefore deny Defendants' Motion for Summary Judgment as to this claim.

XIV. This Amendment requires state actors to treat all "similarly situated" persons alike. *See City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). To bring a successful § 1983 claim for "denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they receiv[ed] different treatment from that received by other individuals similarly situated." *Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992) (internal quotation marks omitted).  More specifically, "in the [racial] profiling context, [the plaintiff] [is] required to prove that the actions of . . . officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002). "To prove discriminatory effect, [the plaintiff has] to show that [he] is a member of a protected class and that [he] was treated differently from similarly situated individuals in an unprotected class." *Id.* at 206.

It is undisputed that Lawson, an African-American male, is a member of a protected class. However, Lawson provides no evidence of purposeful discrimination. Nor does he proffer any examples of similarly situated individuals in an unprotected class (or any similarly situated individuals, for that matter) who received different treatment. I will therefore grant Defendants' Motion for Summary Judgment as to Lawson's equal protection claim.

### 3.  Fourteenth Amendment Due Process Claim

Lawson claims that Defendants violated his due process rights by arresting, incarcerating, and prosecuting him without probable cause. Lawson's substantive and procedural due process claims, however, fail to survive summary judgment.

### a. Substantive Due Process

Defendants request summary judgment as to this claim because the Fourth Amendment—not the Due Process Clause—provides the appropriate analysis for Lawson's claim under the "more-specific-provision rule."

"Noting its 'reluctan[ce] to expand the concept of substantive due process,' the Supreme Court has established the 'more-specific-provision rule.'" *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842-44 (1998). Under this rule, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997). For this reason, in *Albright v. Oliver*, the Supreme Court declined to "recognize a substantive right under the Due Process Clause . . . to be free from criminal prosecution except upon probable cause" and held that "it is the Fourth Amendment, and not substantive due process, under which [such a] . . . claim must be judged." 510 U.S. 266, 268, 271 (1994) (plurality); *See also Washington v. Hanshaw*, 552 F. App'x 169, 172-73 (3d Cir. 2014) ("[T]he Court has held that, if a right to be free from prosecution absent probable cause exists, it must instead be grounded on the Fourth Amendment's prohibition on unreasonable searches and seizures."). Thus, where the Fourth Amendment covers alleged misconduct—such as searches and seizures without probable cause—a plaintiff's claims must be analyzed under the Fourth Amendment, not under the rubric of substantive due process.

Lawson's claim is covered by the specific protections of the Fourth Amendment. Specifically, Lawson's arrest and 54-day pretrial detention are seizures within the meaning of the Fourth Amendment. *See Schneyder v. Smith*, 653 F.3d 313, 321-22 (3d Cir. 2011) ("When the

state places constitutionally significant restrictions on a person's freedom of movement for the purpose of obtaining his presence at a judicial proceeding, that person has been seized within the meaning of the Fourth Amendment.") (footnote omitted). I will therefore grant Defendants' Motion for Summary Judgment as to Lawson's substantive due process claim, because it is covered by a more-specific constitutional provision: the Fourth Amendment.

**b. Procedural Due Process**

Defendants argue that the procedures available to Lawson—a prompt arraignment and preliminary hearing—were constitutionally adequate.

To state a § 1983 claim for deprivation of procedural due process, a plaintiff must demonstrate that (1) he was deprived of an individual interest included within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." *Hill v. Borough of Kutztown,* 455 F.3d 225, 233–34 (3d Cir. 2006). However, "[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person." *Baker v. McCollan*, 443 U.S. 137, 145 (1979) (internal quotation marks omitted).

Lawson's only conceivable claim is that his pretrial detention without probable cause deprived him of liberty without due process of law. In *Gerstein v. Pugh,* 420 U.S. 103 (1975), the Supreme Court identified the constitutionally-required procedures that states must provide to pretrial detainees, such as Lawson. The *Gerstein* Court grounded its analysis in the requirements of the Fourth Amendment, finding that

> The Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases, *including the detention of suspects pending trial*.

*Gerstein,* 420 U.S. at 125, n.27 (emphasis added). Accordingly, the *Gerstein* Court held that the Fourth Amendment is satisfied when the state promptly provides pretrial detainees with a judicial probable cause determination before imposing significant restraints on their liberty. *See Gerstein,* 420 U.S. at 125. This neutral probable cause determination must generally be provided within 48 hours of arrest, absent extraordinary circumstances. *See Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). *Gerstein* rejected, however, the idea that the Fourth Amendment entitles pretrial detainees to an adversary hearing. *See Gerstein,* 420 U.S. at 119-20.

Lawson fails to explain or demonstrate how the procedures available to him either failed to afford him due process of law or failed to meet the procedural requirements articulated in *Gerstein.* In accordance with *Gerstein* and Pennsylvania law, Lawson was arraigned within 48 hours of his arrest, and this arraignment procedure included a probable cause determination by a neutral magistrate judge.[9] *See* Pa. R. Crim. P. 540 ("If the defendant was arrested without a warrant . . . , unless the issuing authority makes a determination of probable cause, the defendant shall not be detained."); *see also Stewart v. Abraham*, 275 F.3d 220, 228-29 (3d Cir. 2001) ("The Pennsylvania law requiring probable cause for arrests and a preliminary arraignment within 48 hours satisfies all that the Fourth Amendment requires[.]"). After Lawson's arraignment, Pennsylvania law also afforded Lawson a preliminary hearing at which the prosecution was required to demonstrate its *prima facie* case. *See* Pa. R. Crim. P. 543 ("If there is no offense for which a *prima facie* case has been established, the issuing authority shall discharge the defendant."). Accordingly, when the prosecution failed to establish its *prima facie* case against Lawson, the state dismissed the charges against him.

Lawson thus not only received the prompt judicial probable cause determination required by *Gerstein*, but also a preliminary hearing at which the charges against him were actually

---

[9] There is no indication that Lawson was not arraigned in accordance with this procedure.

dismissed. Although Lawson's preliminary hearing was continued several times, this delay does not provide a basis for a constitutional claim. First, two of the continuances were at the defense's request. More importantly, although Pennsylvania law provides pretrial detainees with a preliminary hearing at which the state must present its *prima facie* case, this is not a constitutionally required procedure. *See Stewart*, 275 F.3d at 231 ("Pennsylvania's requirement that . . . the state present[] evidence constituting a *prima facie* case of guilt before a magistrate at . . . the preliminary hearing is not necessary to satisfy the requirements of the Fourth Amendment under *Gerstein* . . . . [Nor] is there any constitutional mandate . . . ."). Therefore, any small delay in providing this hearing does not constitute a constitutional violation. Lawson fails to demonstrate that he was denied any of the procedures required by the Fourth Amendment under *Gerstein*. He also fails to identify what additional procedures, if any, due process required. I will thus grant Defendants' Motion for Summary Judgment as to Lawson's procedural due process claim.

### 4. § 1983 Claims Against Canale

Lawson also brings § 1983 claims against Police Chief Canale in his individual capacity. Defendants argue that summary judgment is proper, because Lawson presents no evidence that Canale had any knowledge of, or personal involvement in, the decision to arrest and file charges against Lawson.

To be individually liable under § 1983, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior.*" *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see also C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000) ("It is, of course, well established that a defendant in a civil rights case cannot be held responsible for a constitutional

violation which he or she neither participated in nor approved."). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode*, 845 F.2d at 1207.

Lawson does not produce any evidence that indicates Canale had personal involvement in the alleged misconduct. To the contrary, the record suggests the opposite—that Canale had no involvement in and was not aware of the incident until Lawson filed suit. As a matter of law, it is insufficient to subject Canale to liability in his individual capacity without demonstrating his personal involvement in Lawson's arrest. *See Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3d Cir.1988) (police commissioner and mayor dismissed from suit because plaintiff's complaint did not allege that either was personally involved in any activity related to decedent's suicide). I will therefore grant Defendants' Motion for Summary Judgment as to all § 1983 claims against Canale.

### 5. § 1983 *Monell* Claim Against the City of Coatesville

Lawson also brings a § 1983 *Monell* claim against the City of Coatesville. Lawson alleges that Coatesville and/or Canale[10] were deliberately indifferent to the need for more police training, supervision, and discipline with respect to Fourth Amendment violations. Coatesville moves for summary judgment on the grounds that Lawson fails to identify or provide sufficient evidence of a municipal policy or custom sufficient to hold the city liable under *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978).

Although § 1983 can be used to obtain relief from local governments, it does *not* hold governments vicariously liable for their employees' illegal acts. *Bd. of Cnty. Comm'rs of Bryan*

---

[10] To assert *Monell* liability, a plaintiff must show that an official who has the power to make policy is responsible for the alleged policy or custom. *Andrews v. City of Phila.,* 895 F.2d 1469, 1480 (3d Cir. 1990). "The question of who is a 'policymaker' is a question of state law. In looking to state law, a court must determine which official has final, unreviewable discretion to make a decision or take an action." *Id.* at 1481 (citation omitted). The parties do not dispute that Canale is a final policymaker for Coatesville.

*Cnty., Okl. v. Brown,* 520 U.S. 397, 403 (1997). Rather, liability "must be founded upon evidence that the government unit *itself supported* a violation of constitutional rights." *Watson v. Abington Twp.*, 478 F.3d 144, 155 (3d Cir. 2007) (emphasis added). "Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Brown*, 520 U.S. at 400.

Thus, municipal liability attaches only when "execution of a government's policy or custom . . . inflicts the injury." *Monell*, 436 U.S. at 694. "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Andrews v. City of Phila.,* 895 F.2d 1469, 1480 (3d Cir.1990) (internal quotation marks omitted). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990). "In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the *proximate cause* of the injuries suffered." *Watson*, 478 F.3d at 156 (emphasis added).

Lawson does not provide evidence of any particular municipal policy that caused his alleged injuries. Rather, the un-contradicted evidence in the record shows that Coatesville had policies in place to ensure that police officers understood probable cause, that citizen complaints were investigated, and that officers were disciplined for misconduct. Lawson also fails to provide sufficient evidence that Coatesville and/or Canale had a custom—a well-settled and permanent course of conduct—of not enforcing these policies.[11] Instead, Lawson's primary claim is that

---

[11] Lawson appears to argue that Coatesville had a custom of failing to investigate citizen complaints against police officers. In support of this claim, Lawson provides evidence that Jeffrey Martin complained

Canale was deliberately indifferent to a pattern of constitutional violations and the need for more officer training, and that this qualifies as an official policy.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). However, the Supreme Court has emphasized that a government's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). The failure to train must thus amount to "*deliberate indifference* to the rights of persons with whom the police come into contact." *Id.* at 388 (emphasis added). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a *known or obvious* consequence of his action." *Brown*, 520 U.S. at 410 (emphasis added). In order to support a claim of deliberate indifference, identification of "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary'" to demonstrate that policymakers had notice of the tortious conduct and thus exhibited deliberate indifference by failing to act.[12] *Connick*, 131 S. Ct. at 1360. "Without notice that a course of training is deficient

---

about the two incidents in which Ingemie arrested Martin on invalid warrants. Martin says he never received a response to these complaints. Martin also vaguely references additional complaints that he and Lovelace made after their lawsuit against Coatesville settled in 2011, but does not describe the nature of these post-2011 complaints or indicate what action the police department took in response to these later complaints. Martin claims only that Canale himself never personally responded to these complaints and ignored their phone calls. This evidence is not sufficient to support the inference that Coatesville had a pattern of failing to investigate complaints, let alone that it *customarily* failed to investigate citizen complaints. Lawson presents no evidence that other Coatesville citizens filed complaints or that any such complaints were ignored. Standing alone, Martin's experience does not suffice to support a *Monell* claim that an unconstitutional custom—a *well-settled* and *permanent* course of conduct—existed in Coatesville.

[12] An alternative to identifying a pattern of similar violations exists only in a "narrow range of circumstances" in which the failure to train would result in an obvious and "highly predictable" violation

in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

Given this stringent standard of fault, Lawson does not proffer sufficient evidence to support a *Monell* failure to train claim. First, Lawson does not provide evidence supporting his conclusory allegations that a training deficiency existed. Rather, the record shows that Coatesville police officers are comprehensively trained in arrests and the requirements of probable cause during the course of their Act 120 Training, annual Act 180 updates, and field training. Second, even if the training could be considered deficient, Lawson also fails to provide evidence that Canale knew that such a training deficiency existed or that he disregarded a known or obvious consequence of failing to provide additional training. Significantly, Lawson fails to identify "[a] pattern of similar constitutional violations by untrained employees" that would alert Canale to the need for training. *Connick*, 131 S. Ct. at 1360. In fact, Lawson identifies no other instance in which a Coatesville police officer arrested the wrong person after a witness identification, no other instance in which an officer arrested a citizen merely because his race/gender matched that of a suspect, and no other instance in which an officer falsely arrested a citizen with no apparent connection to a crime merely because he was standing in the vicinity.

Instead, Lawson only provides evidence of four *dissimilar* "false arrest" claims filed by Jeffrey Martin and Tekeesha Lovelace. Martin alleged that Ingemie wrongly arrested Martin on

---

of constitutional rights—such as if a city deployed its untrained police force with firearms to capture fleeing felons without training officers on the use of deadly force. *Connick*, 131 S. Ct. at 1361. This alternative theory of deliberate indifference to a "highly predictable" violation is referred to as "single-incident" liability. *Id.* Lawson does not appear to argue that this "single-incident" theory applies to his case. In any event, this theory of liability cannot support his *Monell* claim, because the obvious "need for specific legal training . . . is absent here." *Id.* at 1361. There is no dispute that Coatesville Police Officers are trained in the requirements of probable cause and continue to receive legal updates on these requirements through Act 180. Thus, any need for additional nuanced training is not patently obvious, absent a pattern of similar violations. *See Id.* at 1363 ("That sort of nuance simply cannot support an inference of deliberate indifference here.").

two warrants: (1) a domestic relations warrant that was no longer valid because it had been satisfied and (2) a traffic warrant for a different man, also named Jeffrey Martin—a case of mistaken identity. Martin contended that Ingemie ignored Martin's protestations that the warrants were invalid and did not properly check the validity of these warrants. These incidents might be relevant to Lawson's case if Lawson were arrested on an inaccurate warrant. However, any additional training that might have improved Coatesville's warrant-checking accuracy would not have benefitted Lawson, who was arrested *without* a warrant. Martin's allegations are far too dissimilar to support a finding of "deliberate indifference." *See Connick*, 131 S. Ct. at 1360 (finding that four prior *Brady* violations that did not involve a "failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind" "could not have put [the DA] on notice that the office's *Brady* training was inadequate with respect to th[at] sort of *Brady* violation . . . .").

Similarly, Tekeesha Lovelace, Martin's wife, also alleged that the Coatesville Police Department falsely arrested her on two occasions after she crashed her car into a person's fence and into a person's garage, and the police accused her of driving under the influence. Lovelace claimed that she was not intoxicated and that the police lacked probable cause to arrest her. At best, these incidents may have alerted Canale to the potential need for more training on probable cause in the context of a suspected DUI. However, any additional training that Coatesville might have provided on probable cause and intoxication would not have benefitted Lawson. Once again, these incidents are too dissimilar to demonstrate that Canale consciously disregarded a recurring training deficiency. However, even if these two incidents could somehow be considered similar to Lawson's claim, they also do not constitute a "pattern" sufficient to support

a finding that Canale was deliberately indifferent to a known or obvious consequence of his actions. *See Brown*, 520 U.S. at 407-08.

Without identifying a pattern of similar constitutional violations, Lawson has failed to meet his burden of demonstrating that Coatesville was "deliberately indifferent" to a training deficiency.[13] I will therefore grant Coatesville's Summary Judgment Motion as to Lawson's *Monell* claim.

### 6. Qualified Immunity

Boyle and Ingemie argue that even if their conduct may have violated Lawson's rights, they are nonetheless entitled to summary judgment because they are shielded by the doctrine of qualified immunity. "Police officers, embodying the authority of the state, are liable under § 1983 when they violate someone's constitutional rights, unless they are protected by qualified immunity." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). The doctrine of qualified immunity shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[13] Lawson provides evidence that several minority police officers within the Coatesville Police Department experienced discrimination. Importantly, however, these minority police officers also said that they did not know of any instances in which Coatesville police officers unlawfully arrested minority citizens. While evidence of a hostile work environment may support the finding that Coatesville was deliberately indifferent to racial discrimination against *employees*, such a policy has no apparent causal connection to the harm that Lawson alleges. First, there is no evidence that Lawson's arrest was motivated by race. Second, any failure to properly address racial tensions experienced by minority police officers cannot be said to have caused Lawson's constitutional harm. That causal link, if any, is far too attenuated to support a *Monell* claim. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."); *Watson v. Abington Twp.*, 478 F.3d 144, 157 (3d Cir. 2007) (refusing to infer causation from generalized evidence of racism in a police department in the absence of evidence of a custom relating to the specific constitutional violation alleged). To support a *Monell* claim, Lawson must show that Coatesville's actions were the "moving force" behind his constitutional injury. Lawson has failed to demonstrate that any failure to adequately address discrimination against minority police officers proximately caused his injury.

would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted).

The Supreme Court has established a two-part analysis that governs when an official is entitled to qualified immunity. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). To determine whether a government actor is entitled to qualified immunity a court must consider two questions: (1) whether the facts taken in the light most favorable to the plaintiff show that an officer's conduct violated a constitutional right, and (2) whether the right is clearly established so that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Id.* at 201-02. "If the plaintiff fails to satisfy either prong, the defendant is entitled to judgment as a matter of law." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012).

With respect to the first question, taking the facts most favorable to Lawson, Middleton *did not* identify Lawson to the officers. A reasonable jury might thus find that Boyle and Ingemie arrested Lawson without probable cause, thus violating his Fourth Amendment rights. With respect to the second question, there can be little doubt that the right to be free from searches, seizures, and prosecutions that lack probable cause is clearly established. If Middleton did not identify Lawson, Boyle and Ingemie may have arrested, incarcerated, and initiated criminal proceedings against Lawson knowing that Middleton did not identify Lawson and that they therefore lacked probable cause. Such action would be contrary to clearly established law and "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The qualified immunity question thus hinges on a material dispute of historical fact that should be decided by a jury: Did Boyle and Ingemie arrest Lawson despite knowledge that Middleton had not identified him? *See Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004) ("[Q]ualified immunity is an objective question to

be decided by the court as a matter of law. The jury, however, determines disputed historical facts material to the qualified immunity question.") (citation omitted). If this factual question is answered in the affirmative, Boyle and Ingemie would not be entitled to qualified immunity. I will therefore deny summary judgment on the question of qualified immunity.

**B.    § 1985 Claims**

Lawson also brings § 1985 claims against Defendants for conspiracy to interfere with civil rights. Section 1985(3) imposes civil liability "[i]f two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]" 42 U.S.C. § 1985(3). To survive summary judgment, Lawson must set forth sufficient facts that would allow a jury to find "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons [of] the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citing *United Bhd. of Carpenters and Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983)). The Third Circuit has elaborated that "a plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious." *Farber v. City of Paterson,* 440 F.3d 131, 135 (3d Cir. 2006); *see also Robinson v. McCorkle*, 462 F.2d 111, 113 (3d Cir. 1972) ("A conspiracy claim based upon § 1985(3) requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals.") (internal quotation marks omitted).

Lawson's § 1985(3) claim fails on two grounds. Lawson fails to provide sufficient evidence (1) that Boyle and Ingemie entered into a conspiracy and (2) that any such conspiracy was motivated by discriminatory animus designed to deprive Lawson of equal protection of the laws. First, there is no evidence of an agreement between the officers. That the two officers both assisted with Lawson's identification and arrest is insufficient to show that they conspired to undertake action to deprive Lawson of equal protection. Furthermore, to succeed on his § 1985(3) claim, Lawson would need to demonstrate that there was an "invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The record lacks sufficient evidence for a reasonable jury to conclude that Lawson's arrest was motivated by such discriminatory animus.[14] Furthermore, there is zero evidence that Canale participated in Lawson's arrest at all, let alone that he entered into a conspiracy. I will thus grant Defendants' Motion for Summary Judgment as to Lawson's § 1985 claims.

---

[14]      At best, Lawson provides evidence that some police officers (neither Boyle nor Ingemie) in the Coatesville Police Department had previously posted racist comments on Facebook, that one officer (neither Boyle nor Ingemie) had a confederate flag license plate on his vehicle, and that multiple officers had called some minority Coatesville residents "mutants." The only evidence of such behavior with respect to Ingemie is that, on one occasion in June 2012, Ingemie called Tekeesha Lovelace a "Coatesville mutant," but did not arrest her. There is no evidence, however, that Boyle ever called anyone a "mutant" or made any other racist comment. Even if Ingemie's single use of the word "mutant" to Lovelace could potentially provide evidence of discriminatory animus with respect to Ingemie, there is no evidence that Boyle shared this animus. In order to state a § 1985(3) claim, *at least two people* must conspire and be motivated by discriminatory animus.

     Lawson also lacks evidence that Boyle or Ingemie expressed racial animus towards *Lawson* and that they *agreed* to arrest him because of that invidious animus. There is no evidence that any officer made any racial comments to Lawson. Furthermore, the record demonstrates that Lawson was not targeted at random merely because of his race. It is undisputed that when the police arrived, Middleton said that the robbers were still across the street and directed the officers to where Maxwell—one of the robbers—was standing. It is also undisputed that Lawson was talking and standing right next to Maxwell at this time. While the facts indicate that the officers might have lacked probable cause, they do not demonstrate the type of invidious discriminatory animus against Lawson that is required to state a § 1985(3) claim.

### C. State Law Claims Under Pennsylvania Law

Lawson brings state law claims against Boyle, Ingemie, and Canale for the torts of false arrest, false imprisonment, malicious prosecution, and civil conspiracy. Defendants argue that they are immune from these claims under the Political Subdivision Tort Claims Act ("PSTCA"). They further argue that Lawson does not provide sufficient evidence to support a civil conspiracy against them.

#### 1. Pennsylvania Subdivision Tort Claims Act

The Pennsylvania Subdivision Tort Claims Act ("PSTCA") governs when a municipality or its employees may be held liable for tortious conduct. The PSTCA provides: "Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof . . . ." 42 PA. CONS. STAT. ANN. § 8541.[15] This official immunity also extends to any employee of a local agency as long as the employee caused the injury while acting within the scope of his or her office or duties. *Id.* § 8545. However, an employee may still be held liable where his conduct constituted a "crime, actual fraud, actual malice or willful misconduct." *Id.* § 8550. All three individual Defendants argue that they are entitled to immunity, because they did not engage in willful misconduct.

##### a. Boyle and Ingemie

Boyle and Ingemie argue that they did not engage in willful misconduct, because they believed that probable cause existed for Lawson's arrest. "[W]ilful misconduct means that the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue." *Evans v. Phila. Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965).

---

[15] Lawson's Amended Complaint asserts state law claims only against Boyle, Ingemie, and Canale, not the City of Coatesville.

Although willful misconduct has been equated with intentional torts, "[t]his equation has no validity in the context of a lawsuit based upon police conduct, however." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). The fact that a police officer commits a so-called intentional tort is insufficient absent a showing that the police officer *intended* to bring about the result that followed. Thus, even if the jury finds that Boyle and Ingemie lacked probable cause, this is not enough. The jury must also find that they intentionally arrested Lawson knowing that they lacked probable cause to do so. *See Renk*, 641 A.2d at 293-94 (explaining that in a false imprisonment case, a police officer acts with willful misconduct only when he deliberately arrests a person knowing that he lacks probable cause).

In this case, there is a genuine dispute over whether Middleton identified Lawson to Boyle and Ingemie. If the jury believes Middleton's claim that he did not identify Lawson, a jury could conclude that Boyle and/or Ingemie intentionally arrested and initiated prosecution of Lawson knowing that they lacked probable cause. Such action would constitute willful misconduct. There is thus a genuine dispute of material fact as to whether Boyle and Ingemie are entitled to immunity under the PSTCA. As Boyle and Ingemie do not provide any additional compelling basis for granting summary judgment as to Lawson's false arrest, false imprisonment, and malicious prosecution[16] claims, I will deny summary judgment as to these claims.

---

[16] As with Lawson's § 1983 malicious prosecution claim, Defendants argue that summary judgment is proper as to Lawson's state malicious prosecution claim, because they did not act with malice. As discussed above, however, malice may be inferred from a lack of probable cause in the malicious prosecution context. *See Kelley v. Gen. Teamsters, Chauffeurs & Helpers, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988) ("Malice may be inferred from the absence of probable cause.").

### b. Canale

Canale argues that he did not engage in willful misconduct, because he was in no way involved with Lawson's arrest. As discussed above, Lawson provides no evidence that Canale had any role in the alleged misconduct. Canale was not even aware of the incident until this lawsuit was filed. Without any knowledge or involvement, Canale cannot be said to have engaged in willful misconduct. He is thus immune from liability under the PSTCA. I will therefore grant Defendants' Motion for Summary Judgment as to all state law claims against Canale.

### 2. Civil Conspiracy

Boyle and Ingemie contend that summary judgment should be granted as to Lawson's civil conspiracy claims, because Lawson has not produced sufficient evidence that they entered into an unlawful agreement or that they acted with malice.

"To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979). "[E]ach must have the intent to do the unlawful thing. That intent must be common to all, and each must understand that the other has that purpose." *Fife v. Great Atl. & Pac. Tea Co.*, 52 A.2d 24, 27 (Pa. 1947). In other words, "[t]here must be a combination, and agreement, a breathing together, and concerted action towards the common purpose." *Id.* Furthermore, "[p]roof of malice, i. e., an intent to injure, is essential in proof of a conspiracy. This unlawful intent must be absent justification." *Thompson Coal*, 412 A.2d at 472 (citations omitted).

"While conspiracy may be proved by circumstantial evidence, the evidence must be full, clear and satisfactory." *Fife,* 52 A.2d at 27. "The mere fact that two or more persons, each with

the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Thompson Coal*, 412 A.2d at 473 (quoting *Fife*, 52 A.2d at 39). "Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence." *Fife,* 52 A.2d at 27.

As discussed above, Lawson provides no evidence that Boyle and Ingemie made an agreement "with intent to do an unlawful act." Rather, the evidence shows only that both officers participated in Lawson's identification and arrest after responding to the scene. Any circumstantial evidence that they acted in accordance with an agreement is far from "full, clear and satisfactory" and does not "raise[] more than a mere suspicion of concerted action toward the [alleged] common objective" of arresting Lawson without probable cause. *Fife*, 52 A.2d at 27. I will therefore grant Defendants' Motion for Summary Judgment as to Lawson's civil conspiracy claim.

## IV. CONCLUSION

For the reasons set forth above, I will grant in part and deny in part Defendants' motion for summary judgment as follows:

- Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims for Fourth Amendment false arrest, unlawful search, false imprisonment, and malicious prosecution will be granted as to Julius Canale.

- Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims for Fourth Amendment false arrest, unlawful search, false imprisonment, and malicious prosecution will be denied as to Brenden Boyle and Jeffrey Ingemie.[17]

- Defendants' Motion for Summary Judgment as to Plaintiff's § 1983 claims for Fourteenth

---

[17] Because there is an outstanding question as to whether Defendants had probable cause to arrest Lawson, qualified immunity will be denied at this time.

Amendment violations of the Equal Protection Clause and the Due Process Clause will be granted as to all Defendants.

- Defendants' Motion for Summary Judgment as to Plaintiff's § 1985 claims will be granted as to all Defendants.

- Defendants' Motion for Summary Judgment as to Plaintiff's state law claims for false arrest, false imprisonment, and malicious prosecution will be granted as to Julius Canale.

- Defendants' Motion for Summary Judgment as to Plaintiff's state law claims for false arrest, false imprisonment, and malicious prosecution will be denied as to Brenden Boyle and Jeffrey Ingemie.

- Defendants' Motion for Summary Judgment as to Plaintiff's state law civil conspiracy claim will be granted as to all Defendants.


s/Anita B. Brody

_____
ANITA B. BRODY, J.


Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: